*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1557**

In the Matter of the Petition of Wells Fargo Bank, N. A.,
for an Order Determining the Boundary Lines and Declaring
Permanent Driveway Easement and Permanent Septic System Easement.

**Filed July 5, 2016
Affirmed
Reilly, Judge**

Crow Wing County District Court
File No. 18-CV-12-1324

Thomas C. Pearson, Daniel M. Hawley, Gammello, Qualley, Pearson & Mallak, PLLC, Baxter, Minnesota (for appellant Lamont V. Peterson)

James M. Lockhart, Karla M. Vehrs, Lindquist & Vennum LLP, Minneapolis, Minnesota (for respondent Wells Fargo Bank)

Considered and decided by Worke, Presiding Judge; Reilly, Judge; and Klaphake, Judge.[*]

**U N P U B L I S H E D   O P I N I O N**

**REILLY**, Judge

In this boundary-dispute action involving Torrens property, appellant challenges the district court's (1) application of the doctrine of boundary by practical location (estoppel); (2) determination that appellant's parcel is encumbered by implied easements; and

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

(3) determination that appellant is not a good-faith purchaser under Minn. Stat. § 508.25 (2014).  We affirm.

## FACTS

Respondent Wells Fargo, N.A. (Wells Fargo) is the fee title owner of real property located in Crow Wing County and legally described as "Lot One (1), Block One (1) of Long Pine Addition" (Parcel A).  Appellant Lamont V. Peterson (Peterson) is the fee title owner of real property adjacent to Parcel A and legally described as:

> The North 105 feet of the South 840 feet of the Southwest Quarter of the Southeast Quarter (SW¼SE¼) of Section Six (6), Township One hundred thirty-seven (137), Range Twenty-eight (28), EXCEPT that part of said SW¼SE¼ described as follows: Beginning at the point of the East line of said SW¼SE¼ which is 450 feet South 1 degree 02 minutes East of the Northeast corner of said SW¼SE¼ thence south 1 degree 02 minutes East, 90 feet, thence South 88 degrees 58 minutes West, 90 feet; thence North 43 degrees 58 minutes East 127.28 feet to the place of beginning.

(Parcel B).

S.G. and S.B.G. previously owned both parcels.  In 1996, they installed a sewer line, a septic tank, and a drain field (the Permanent Septic System) on Parcel B.  In 1999, Crow Wing County issued a construction permit to S.G. and S.B.G. to construct a single-family residence, a garage, and a shed (the Improvements) on Parcel A.  The Improvements straddle the common boundary line between the parcels and encroach onto Parcel B.  The Permanent Septic System exists solely for Parcel A's benefit.  The same year, S.G. and S.B.G. constructed a gravel driveway (the Permanent Driveway) on Parcel B leading directly to a concrete pad on Parcel A and providing access to the home.  The Permanent

2

Driveway enters Parcel A's garage from the south side of Parcel B. There are no documents in existence, recorded or unrecorded, that reference the encroachments on Parcel B.

In May 2005, both properties were conveyed by warranty deed to K.L. and F.L., who jointly owned both parcels until 2010. In August 2006, K.L. and F.L. executed and delivered a home equity line of credit mortgage to CitiBank, securing payment of a credit line in the original amount of $364,000 and encumbering Parcel B (the CitiBank Mortgage). In November 2007, K.L. and F.L. executed and delivered a real estate mortgage to Wells Fargo, securing payment of a Promissory Note in the original principal amount of $645,000, and encumbering Parcel A (the Wells Fargo Mortgage). K.L. and F.L. later defaulted on the terms of both mortgages and Wells Fargo and CitiBank initiated foreclosure proceedings on their respective parcels. Parcel A was sold at a public foreclosure auction to Wells Fargo in July 2009 for $691,931.04. The district court issued an order in June 2010, confirming the foreclosure sale and issuing a new certificate of title in favor of Wells Fargo. In February 2010, the Crow Wing County Sheriff sold Parcel B at a public foreclosure auction to CitiBank for $259,900.

In spring 2010, Peterson contacted a realtor to inquire about purchasing both properties. Peterson was aware that two different banks owned the different parcels. In April 2010, Peterson and his domestic partner sought to purchase Parcel A from Wells Fargo for $329,000 (the Wells Fargo Purchase Agreement). The Wells Fargo Purchase Agreement ultimately did not close. CitiBank offered to sell Parcel B to Peterson for $100,000, and he countered with an offer of $50,000. The parties agreed on a purchase

3

price of approximately $60,000. In November 2010, CitiBank conveyed Parcel B to Peterson pursuant to a special warranty deed and the district court confirmed the sale and issued a new certificate of title in his favor.

In March 2012, Wells Fargo filed a petition with the district court arguing that at the time Peterson acquired Parcel B, he "knew or should have known that the Improvements and the driveway encroached" upon his property. The petition alleged that Peterson "was not a good faith purchaser" and should therefore be estopped from disputing Wells Fargo's "right to maintain and continue [to] use" the Improvements where they currently exist. Wells Fargo sought the following relief:

> [A]n Order (1) determining the boundary line between Parcel A and Parcel B of the land described in Certificate of Title Nos. 89246 and 90287½, to be north of the Improvements, whereby the Improvements will no longer encroach onto Parcel B and straddle the boundary line; (2) granting [Wells Fargo] a permanent easement for the driveway; and (3) declaring that [Peterson] is not a good-faith purchaser of Parcel B and acquired that property with actual or constructive notice of the inconsistent outstanding rights or claims of others.

The Crow Wing County Examiner of Titles prepared an Examiner's Report certifying that he examined the county records and found that Wells Fargo "has a reasonable claim to ownership regarding boundary line issues and easement issues" on Parcel B. The Certificate of Survey also reflects that the Improvements lie on Parcel A and encroach onto Parcel B, with the driveway completely within Parcel B.

Wells Fargo filed an Amended Petition on April 8, 2013, seeking the following relief:

4

> i. determining that the North boundary line of the land described in Certificate of Title No. 89246 and the South boundary line of the land described in Certificate of Title No. 90287½ is adjusted and realigned as shown on the Proposed Boundary Sketch attached hereto as Exhibit O and directing that the new common boundary line be marked by judicial landmarks;
>
> ii. authorizing and directing the Surveyor . . . to (i) enter upon the land in Certificate of Title No. 90287½ and do all things necessary and required to survey the land in said certificate, (ii) to survey the Permanent Driveway Easement and the Permanent Septic Easement, (iii) to provide the Court and the parties with the legal descriptions to be used for the Permanent Driveway Easement and Permanent Septic Easement, and (iv) provide the Court and the parties with new legal descriptions for Parcel A and Parcel B, which conform to and are aligned with the new common boundary line between Certificate of Title No. 89246 and Certificate of Title No. 90287½;
>
> iii. directing the Registrar of Titles to receive for registration as a memorial on Certificate of Title No. 89246 and Certificate of Title No. 90287½, a certified copy of the plat of survey showing the placement of judicial landmarks.

The district court held a court trial in March 2015. During his testimony, Peterson confirmed that prior to purchasing Parcel B, he was aware that the Improvements and the driveway pad overhung the boundary line between the parcels, and that the Permanent Driveway and the Permanent Septic System were located on Parcel B. Peterson testified that if he had purchased Parcel A, he expected to use the driveway that cuts through Parcel B to get to the home on Parcel A. The district court found that Peterson "credibly testified" that he understood that he was purchasing Parcel B "as is," subject to any legal encumbrances existing as a result of the Improvements, the Permanent Driveway, and the Permanent Septic System. Peterson acknowledged that he received a discount on the

5

purchase price for buying an encumbered property. The district court issued its findings of fact, conclusions of law and order in April 2015, realigning the northern border of Parcel A and the southern border of Parcel B. This appeal follows.

**D E C I S I O N**

Appellant asserts three arguments on appeal. First, appellant claims that the district court erred in its application of the doctrine of boundary by practical location (estoppel). Next, appellant argues that the district court erred by determining that Parcel B is encumbered by implied easements. Finally, appellant asserts that the district court erred by determining that appellant is not a good-faith purchaser under Minn. Stat. § 508.25. We address each argument in turn and deny appellant's claims for relief.

### I. Boundary by Practical Location

Peterson challenges the district court's decision to realign the property boundary under the doctrine of practical location by estoppel. Boundary by practical location is a doctrine used to transfer title between deed holders. *Slindee v. Fritch Invs.*, LLC, 760 N.W.2d 903, 907 (Minn. App. 2009) (citing *Gabler v. Fedoruk*, 756 N.W.2d 725, 728–29 (Minn. App. 2008)). A party may be deemed to have transferred title under this doctrine: (1) by acquiescing in the boundary for a sufficient period of time to bar a right of entry under the statute of limitations; (2) by expressly agreeing with the other party on the boundary and then by acquiescing to that agreement; or (3) by estoppel. *Id.* (citing *Theros v. Phillips*, 256 N.W.2d 852, 858 (Minn. 1977)). "The party considered the disseizor of the land must present evidence that establishes the boundary's practical location clearly, positively, and unequivocally." *Id.* A boundary determination presents mixed questions

6

of fact and of law. *Id.* We review the district court's factual determinations for clear error, but determining whether the district court's factual findings support its legal conclusions is a question of law subject to de novo review. *Id.* (citation omitted).

A party seeking relief under an estoppel theory must demonstrate that "[t]he party whose rights are to be barred . . . silently looked on with knowledge of the true line while the other party encroached thereon or subjected himself to expense which he would not have incurred had the line been in dispute." *Theros*, 256 N.W.2d at 858. "[E]stoppel requires knowing silence on the part of the party to be charged and unknowing detriment by the other." *Id.* at 859. The district court applied the estoppel analysis and concluded that Wells Fargo established that it was entitled to relief "as a matter of equity." The district court determined, based on the evidence produced at trial, that Peterson "obtained Parcel B at a significant discount because he took it subject to the encroachments and that Wells Fargo had no knowledge of the encroachments when it invested substantial amounts of money toward a mortgage loan which later defaulted."

Peterson argues that estoppel does not apply because K.L. and F.L. owned both parcels from 2005 to 2010, whereas Peterson did not become aware of the properties until 2010. Peterson admitted during trial that he became aware of the encroachments on Parcel B "almost immediately" upon seeing the property, and acknowledged that he got a discount for taking the property subject to the encroachments. The district court found that Peterson knew of the encroachments when he negotiated for a lower purchase price with CitiBank, while Wells Fargo had "no actual knowledge of the encumbrances" when it made the mortgage loan to K.L. and F.L. The district court concluded that allowing Peterson to

7

challenge the encroachments would be to the "significant detriment of Wells Fargo" and "contrary to all equitable notions of justice," and we agree. *See Wenzel v. Mathies*, 542 N.W.2d 634, 643 (Minn. App. 1996) (granting a district court broad discretion when fashioning remedies to accomplish justice). We determine that the district court's factual findings are supported by the record and are not clearly erroneous, and we determine based on our de novo review that the district court's findings support its decision to realign the property boundary under the doctrine of practical location by estoppel.

## II. Implied Easements

Peterson challenges the district court's determination that Parcel B is encumbered by an implied easement by necessity. "An easement by necessity falls within the general category of implied easements, which arise only in specific fact situations." *Niehaus v. City of Litchfield*, 529 N.W.2d 410, 412 (Minn. App. 1995) (citation omitted). "An easement implied by necessity is created when: (1) 'there is a separation of title; (2) the use which gives rise to the easement shall have been so long continued and apparent as to show that it was intended to be permanent; and (3) that the easement is necessary to the beneficial enjoyment of the land granted.'" *Magnuson v. Cossette*, 707 N.W.2d 738, 745 (Minn. App. 2006) (quoting *Romanchuk v. Plotkin*, 215 Minn. 156, 160-61, 9 N.W.2d 421, 424 (1943)). The existence of an implied easement is determined at the time of severance and a subsequent change of conditions does not defeat or create an implied easement. *Clark v. Galaxy Apartments*, 427 N.W.2d 723, 726 (Minn. App. 1988).

Peterson does not challenge the district court's finding that there was a separation of title and that the encroachments were "sufficiently continued and apparent to show it

8

was intended to be permanent." We inquire into whether the easements were necessary to the beneficial enjoyment of the land at the time of severance in 2009, when Parcel A was sold at a public foreclosure sale separately from Parcel B. *See Lake George Park, L.L.C. v. Mathwig*, 548 N.W.2d 312, 313 (Minn. App. 1996) (noting that other jurisdictions view that severance of title occurs when "possessory interests diverge"). To be "necessary," an easement must be more than a mere convenience, although it "need not have been indispensable to be necessary; rather, a reasonable necessity at the time of severance is sufficient." *Magnuson*, 707 N.W.2d at 745 (citing *Clark*, 427 N.W.2d at 727). The party asserting an implied easement bears the burden of proving its necessity. *Id*. We have previously recognized that "[o]bstacles such as topography, houses, trees, zoning ordinances, or the need for extensive paving, may create conditions where an easement is necessary." *Id*. (citation omitted).

Peterson argues that the easements were not necessary because there was no evidence produced at trial regarding the costs associated with remedying the encroachments at the time of severance. Peterson relies on our decision in *Niehaus*, in which we determined that the district court improperly evaluated the creation of an implied easement, stating:

> The record reveals some discussion of the *current* cost of moving the utility lines, and the findings of fact reflect that removal now would be "expensive and very inconvenient." However, this information carries no weight in determining the necessity of an implied easement. Absent any discussion of necessity at the time of severance, we must hold that the findings do not satisfy the third element either.

529 N.W.2d at 412 (internal citation omitted).

9

*Niehaus* is not persuasive. In that case, the City of Litchfield mistakenly built utility lines outside of its easement area at the same time the property-owner was subdividing the property to sell individual lots. *Id*. at 411. The city sought an implied easement against the subsequent owner of one of those lots, and we held that the city could not show long continued use because the severance was concurrent with the construction of the utility lines. *Id*. at 412. In this case, it is undisputed that the implied easements were created in 1996 and 1999, several years before severance of title took place in 2009, and *Niehaus* does not therefore guide our analysis.

Here, the district court made the following factual findings: that the septic systems, driveway access, and residential improvements played a "significant, and even crucial, role in the use and enjoyment of property like Parcel A"; that "[t]he existing Permanent Driveway and Permanent Septic System are necessary to the use, enjoyment and marketability" of Parcel A; and that in the event the Improvements were relocated, "Parcel A will be substantially less marketable . . . and the beneficial use and enjoyment of Parcel A will be substantially affected." Based on these factual findings, the district court concluded that Wells Fargo met its burden of establishing that "the Improvements, Permanent Septic System and Permanent Driveway are reasonably necessary and convenient for the beneficial enjoyment of Parcel A."

The trial record supports the district court's determination that the Improvements were necessary and convenient to the beneficial use of Parcel A. The realtor testified that the home on Parcel A was custom-designed and the design of the driveway is the "best use" of the property. She testified that if the Improvements were relocated or moved, it

would become "a problem for that house," based upon how the house was constructed and the slope of the elevation of the existing driveway. The general contractor testified that the house's floor plan was based on the home opening to the north as it is currently constructed, and moving the garage's apron pad would require "changing the inside" of the house to accommodate a new entry point. The excavator testified that the slope on the south part of the garage is steeper than on the north side, and agreed with the realtor's testimony that seasonal issues such as rain or snow would be more pronounced on the south side slope if the driveway was relocated. The court also heard testimony that driveway access and septic systems are important to the use and enjoyment of a home. The district court's factual findings that the septic systems and improvements played a "significant" role in the use and enjoyment of Parcel A supports the legal conclusion that an easement by necessity burdens Parcel B. Consequently, the district court did not err in concluding that the implied easement was necessary to the beneficial use and enjoyment of the land. We therefore affirm the district court's decision that Parcel B is encumbered by an implied easement by necessity.

### III. Good-Faith Purchaser

Lastly, we turn to the question of whether Peterson is a good-faith purchaser entitled to protection under Minnesota's Torrens Act, which provides that:

> Every person receiving a certificate of title pursuant to a decree of registration and every subsequent purchaser of registered land who receives a certificate of title in good faith and for a valuable consideration shall hold it free from all encumbrances and adverse claims, excepting only the estates, mortgages, liens, charges, and interests as may be noted in the last certificate of title in the office of the registrar, and also

11

excepting any of the following rights or encumbrances subsisting against it, if any:

(1)  liens, claims, or rights arising or existing under the laws or the Constitution of the United States, which this state cannot require to appear of record;

(2)  the lien of any real property tax or special assessment;

(3)  any lease for a period not exceeding three years when there is actual occupation of the premises thereunder;

(4)  all rights in public highways upon the land;

(5)  the right of appeal, or right to appear and contest the application, as is allowed by this chapter;

(6) the rights of any person in possession under deed or contract for deed from the owner of the certificate of title; and

(7) any outstanding mechanics lien rights which may exist under sections 514.01 to 514.17.

Minn. Stat. § 508.25.

The object of Minnesota's Torrens law "is to afford a method of acquiring a decree of registration and a certificate of title free, so far as possible, from all encumbrances and adverse claims not noted on the certificate." *Konantz v. Stein*, 283 Minn. 33, 37, 167 N.W.2d 1, 5 (1969). However, under section 508.25, "a purchaser of Torrens property who has actual knowledge of a prior, unregistered interest in the property is not a good faith purchaser." *In re Collier*, 726 N.W.2d 799, 809 (Minn. 2007); *In re Juran*, 178 Minn. 55, 60, 226 N.W. 201, 202 (1929) (recognizing that the Torrens Act "does not do away with the effect of actual notice"). The burden of proof rests on the party asserting actual knowledge. *Collier*, 726 N.W.2d at 806 (citation omitted).

12

In its order, the district court concluded that "[p]rior to his purchase of Parcel B, Mr. Peterson had actual knowledge of the Improvements, the Permanent Septic System and the Permanent Driveway, all of which encroach onto Parcel B. Due to this, Mr. Peterson was not a good faith purchaser entitled to protection under Minn. Stat. § 508.25." Peterson argues that the district court erred because *Collier* instructs that the term "unregistered interests" is synonymous with the term "unregistered instruments." 726 N.W.2d at 808 ("[T]o be a good faith purchaser of Torrens property, a purchaser cannot have actual knowledge of previous, unregistered interests."). Peterson notes that "[t]here are no documents in existence, recorded or unrecorded, that reference the encroachments on Parcel B," and argues that actual knowledge cannot exist as a matter of law in light of *Collier's* statement equating "interest" with "instrument."

We do not agree with Peterson's interpretation of *Collier* or with his argument that only unrecorded *instruments*—as opposed to unrecorded *interests*—can support an actual-knowledge finding. *See, e.g.*, Minn. Stat. § 508.70 (providing statutory basis for claiming an unregistered interest after registration "which does not appear on the certificate of title"). In *Konantz*, the parties disputed a 90-foot strip of land lying between a tract of real estate owned by respondent Konantz and a tract of real estate owned by appellant Stein. 283 at 35, 167 N.W. 2d at 3. The Konantzes were in possession of the 90-foot strip when registration proceedings commenced, although there was no written instrument reducing the Konantzes's unregistered interest to writing. *Id.* at 38, 167 N.W.2d at 6. Stein argued that the land was not subject to the Konantzes's unregistered interest but our supreme court disagreed:

13

From the evidence in the present record, it is clear that Mrs. Stein was aware when she purchased the registered property in April of 1962 that the Konantzes were in possession of the easterly 90 feet of it. They were apparently using it at the time as a part of a sheep pasture enclosed and bounded by a fence. Mr. Stein testified that he saw and inspected this fence before the purchase and acknowledged that it raised a question as to the location of the boundary line.

. . . .

In view of this testimony, Mrs. Stein must be charged with the knowledge, at and before the time of purchase, that the Konantzes were in possession of this land. . . . [O]nce she became aware that the land in dispute was in the actual possession of a person other than the prospective vendor, it became her duty to ascertain the nature and extent of the possessor's rights and, having failed to do so, she must be charged with the knowledge that the inquiry would have disclosed.

*Id.* at 41-42, 167 N.W.2d at 7-8 (footnote omitted).

A similar situation exists here. The trial testimony is replete with evidence that Peterson knew that the driveway, buildings, and the septic system encroached upon Parcel B, and used that information to negotiate a lower purchase price for the property. Peterson testified that he understood he was taking Parcel B "as is," subject to encroachment of the driveway, the buildings, and the septic system. Peterson stated that he reviewed the title insurance commitment accompanying the property purchase, including that portion of the document regarding exceptions. The exceptions included statements that Peterson purchased the property "[s]ubject to encroachment of adjoining property owner's house and septic system over the southerly property line as disclosed by inspection," and "[s]ubject to encroachment of driveway of property owner to the south over property line."

14

Peterson agreed that he was aware of these encroachments before he purchased Parcel B. In view of his own testimony, the district court did not err in determining that Peterson had actual knowledge of the encumbrance and was not a good-faith purchaser entitled to statutory protection.

The recent case of *Burkhalter v. Mays* considered the protections afforded to good-faith purchasers and to good-faith encumbrancers of Torrens property. 877 N.W.2d 788 (Minn. App. 2016). We noted that a "good-faith purchaser is protected if he lacks actual notice of an interest not memorialized on the certificate of title," but cited *Collier* for the proposition that "[t]he limits of the actual-notice exception are undefined." *Id*. at 794 (citing *In re Collier*, 726 N.W.2d at 809). *Burkhalter* conducted a review of relevant caselaw and noted that "the actual-notice exception is narrow." *Id*. (citations omitted). Based on the unique facts of that case, the *Burkhalter* court found that "no documents memorialized any other extant interest or claim to an interest" on the encumbered property, and further found that "the facts allegedly or . . . known to [the mortgage lender] are insufficient" to constitute actual notice of the equitable-mortgage. *Id*. at 794-95. *Burkhalter* concluded that the lender did not possess actual knowledge of the homeowner's interest in the property sufficient to defeat the lender's good-faith defense. *Id*. at 795. For the reasons stated above, we find that sufficient evidence of actual knowledge exists in this case. The *Burkhalter* opinion "[did] not attempt to decide what minimum facts might constitute actual notice." *Id*. In this case, sufficient facts exist in the record to support the district court's determination that Peterson had actual notice of the encumbrances. The

15

district court did not err in concluding that Peterson was not a good-faith purchaser entitled to protection under Minnesota's Torrens Act, Minn. Stat. § 508.25.

**Affirmed.**